## Robert H. Tinker et al. v. Thomas D. Catlin.

1. PROMISSORY NOTES—*Who is Presumptively a Guarantor.*—A third person who places his name upon the back of a promissory note is presumed to do so as a guarantor, but notwithstanding such presumption he may show that he was, in fact, an accommodation indorser and a surety and that this was known to the payee.

2. TRIALS WITHOUT A JURY—*Finding of the Judge, When Conclusive.* —When the trial is without a jury, the finding of the judge upon questions of fact will not be set aside unless they are clearly and manifestly against the preponderance of the evidence.

**Bill to Vacate a Judgment.**—Appeal from the Circuit Court of Cook County; the Hon. EDMUND W. BURKE, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1901. Affirmed. Opinion filed May 23, 1902.

**Statement.**—Sidney A. Stevens, being, October 1, 1890, indebted to Thomas D. Catlin, appellee, in the sum of $34,290.05, November 24, 1890, in connection with Benjamin H. Campbell, Robert H. Tinker and F. G. Tibbits executed to Catlin a promissory note as follows:

" $34,290.05.                    CHICAGO, Oct. 1, 1890.

Six months after date, for value received, we promise to pay to the order of Thomas D. Catlin the sum of $34,290.05 (Dollars) at the Commercial Bank, with interest at the rate of seven per cent per annum after date, having deposited with the holders as collateral security (certain mentioned bonds and stock, among others, one hundred shares, One Hundred Dollars each, N. W. Safe & L. Co.)

SIDNEY A. STEVENS,
BENJAMIN H. CAMPBELL,
ROBERT H. TINKER,
F. G. TIBBITS."

Tinker v. Catlin.

Four days after the actual making of the note, namely, November 28, 1890, Benjamin H. Campbell died. The note not being paid at maturity, Catlin, having first sold the collateral securities, April 6, 1891, began suit upon it against the three surviving makers, Stevens, Tinker and Tibbits, and June 8, 1891, obtained a judgment against them for $18,169.93. Tinker and Tibbits took an appeal from this judgment to the Appellate Court; the judgment being there affirmed, Tinker and Tibbits appealed to the Supreme Court, where the judgment was again affirmed in June, 1894.

August 3, 1894, Tinker and Tibbits filed in the Circuit Court a bill to vacate and perpetually enjoin the collection of said judgment. This relief was asked upon the assertion that they, Tinker and Tibbits, were merely sureties for Stevens and Campbell on the note upon which judgment had been obtained, and that as such sureties they had been released by the failure of Catlin, as holder of the note, to file his claim thereon against the estate of Campbell, one of the principal makers, who died November 28, 1890, leaving a large estate.

The complainants obtained a preliminary injunction against the collection of the said judgment; an answer, denying the allegations of the bill, was made by Catlin. The case came on for hearing in May, 1900. The witnesses testified orally before the chancellor, Tinker and Tibbits being the principal witnesses for the complainants. At the conclusion of the hearing, no testimony having been given in behalf of the defendants, the court dismissed the bill for want of equity. From such decree this appeal is prosecuted.

The evidence produced before the master tended to show that about August 14, 1885, Sidney A. Stevens purchased $15,000 of stock in the Chicago Safe & Lock Company, of which Campbell was president. To obtain the money to pay for this stock, Stevens made his note of that date for $15,000, payable June 1, 1886, to the order of John J. Mitchell, guardian. This note was indorsed by Campbell, and

at its maturity was extended until June 1, 1887. When the second note fell due he obtained a loan of $35,000 upon a note dated September 30, 1887, payable six months after date. This note was indorsed by Campbell and Tibbits. Tibbits testifies that Stevens told him that Campbell desired that he, Stevens, should obtain some friend to indorse the note under him, Campbell, so that the credit of Campbell would not be affected by the fact that he appeared as the sole indorser for Stevens in so large an amount.

Tibbits testified that Stevens told him that Campbell was a perfectly safe man, very rich, and would see him through, and that he, Tibbits, was influenced to indorse the note because Mr. Campbell's name, a person of wealth and financial responsibility, was upon the note as an indorser. With this note Stevens took up his second $15,000 note, and obtained, in addition, $20,000 from Catlin. It appeared from a letter read into the record that Catlin, when applied to for this loan, went to the Corn Exchange Bank and inquired as to the pecuniary responsibility of Campbell, and the president answered that he would not hesitate to discount Campbell's individual note for $100,000.

Tibbits did not receive anything, and, so far as appears, neither did Campbell, for indorsing this note. Tibbits put his name under that of Campbell, without having any communication with him. Before the last note matured, Stevens wrote to Tibbits, inclosing his note for $35,000, payable one year from September 30, 1887, and saying in the letter:

"Mr. Campbell told me he would indorse the year paper, and so I wish to ask you to do the same. The same collateral is in the year note that was in the six months note, and it is in every respect the same, excepting the additional time. I will be greatly obliged if you will do this."

Tibbits examined the note and saw that the name of Campbell was not upon it; thereupon he indorsed his name low down on the back of the note and took it to Chicago and went to see Campbell, and complained to him because his name was not on the note before his own. He testifies that Campbell said to him: "Mr. Tibbits, don't be alarmed about that note; I will take that note up and pay it myself

—take these securities." Tibbits further testifies: "I objected to having my name first on the note." Campbell said: "Don't be alarmed about that; it is my intention to take up that note myself, and to take these securities myself, and I assure you now I will do it." Campbell indorsed this second $35,000 note under the name of Tibbits, and it was in this condition delivered to Catlin.

Tibbits testified that he received no consideration for putting his name on the back of this note, and had no agreement with any one in reference to his liability, excepting that expressed by the note and the conversation he declares he had with Campbell. So far as appears, Campbell received nothing for indorsing this note. Tibbits also testifies that about the time he indorsed this note, Campbell stated to him: "I have examined this collateral and believe it to be good for the amount of the note, and as soon as I can arrange my transactions and money to do so, and I hope before the note matures, I will take the note up and carry the collaterals myself and keep the collaterals as an investment;" and that Campbell assured him that he need have no fear or responsibility about the paying of the note. When this second $35,000 note matured, a new note for that-sum was made by Stevens and indorsed on the back by him and by Campbell twice, and thereafter by Tibbits, his name being written under that of Campbell.

Tinker testifies that as Stevens was going with this note to the Commercial National Bank he accidentally met him, Tinker, and said to him that he had a note amply secured and amply indorsed which was falling due and the holder of the note desired him to give an additional indorsement or security, "and he asked me (Tinker) if I would be willing to indorse the note, and I looked at it and gave him my indorsement."

Tinker testifies that "Stevens said I could readily see that the paper was safe enough for me to indorse on account of the standing of, particularly, Campbell, and the nature of the securities. I had heard of Campbell before, and had satisfied myself in regard to his financial standing in connec-

tion with an effort to bring the Chicago Safe and Lock
Plant to Rockford. I received no consideration from any
person for indorsing this note nor any of the proceeds
thereof." So far as appears neither Campbell, Tinker nor
Tibbits received any consideration for indorsing these
three $35,000 notes.

When the note maturing October 1, 1889, matured, Ste-
vens again requested and procured from Catlin an extension
by the execution of a fourth note for $35,000, dated Jan-
uary 1, 1890, due in six months after date, for $35,000, and
signed by Stevens, and indorsed first by Campbell, then by
Tibbits and next by Tinker.

Tibbits and Tinker testify that this note, which had been
lost before the trial, was the same as the note of October
1, 1888, with the change of dates, and that there was no
additional consideration, it being a mere renewal. When
this last mentioned note became due Catlin was anxious
that it should be paid; Stevens finally induced him to grant
another extension and thereupon wrote to Tibbits as fol-
lows :

"OCTOBER 1ST, 1890.
DEAR TIBBITS : Yesterday I saw Mr. Catlin, and he
agreed to call off his dogs until October 15th, if Mr. Camp-
bell and you and Bob would become the makers of the
note instead of indorsers and guarantees, as is the case
now. The note will be made to my order and I indorse
and guarantee it. This will put it off for one year and
save just so much trouble. The reason for making this
change is in appearance only, and not in fact. The guar-
antor is in fact the maker, only the other looks better and
helps its sale. Please let me know when you come and set
time and place of meeting you.                     SID."

A letter, counsel for appellants say, " presumably in the
same form, was received by Tinker," and " responding to
these letters Tinker and Tibbits came to Chicago." Tib-
bits and Stevens went to the office of Campbell; they dis-
cussed the situation. Tibbits testifies Campbell said :

" Something ought to be done about that note; Catlin
wanted the money; and he says ' I can't pay it now, shall
have to get an extension. Suppose he would demand addi-

Tinker v. Catlin.

tional securities if the note was extended.' I told him I had nothing free to add to the security at all. I said, ' Mr. Campbell, it has been our understanding between us from the first that you would take this note up;' and he said ' You needn't worry yourself, I will do it, but can't do it now; and to assure you of my sincerity I will say now that I will give Catlin $10,000 more security, if he will give us six months more time.'

We walked over to Town's office; Stevens was there; Town was representing Catlin. Town wanted $20,000 additional security; finally consented to accept $10,000 which Campbell offered to put up of Northwestern Trust & Safe Company, the last collateral enumerated in the note which was signed. Town said it ought to be a joint and several note in that case and he would consult Mr. Catlin if he would accept $10,000 additional security and grant it if they would make it a joint note."

Tibbits testifies that he had a conversation with Catlin and repeated to him that Campbell had told him he would guarantee him against any liability on the note; that he made that statement to Catlin in Town's office at that time; thereafter the note hereinbefore mentioned upon which judgment was obtained was executed.

In a letter written by Sidney Stevens to Breese Stevens, dated November 24, 1890, he says:

"DEAR BROTHER: Messrs. Campbell, Tibbits, Tinker and I met Mr. Town at his office this morning. After considerable talk, Mr. Town, in view of the present stringency in the money market, said he would give a six months extension of the Catlin claim, if Campbell would put up $30,000 in security as additional collateral. This Mr. Campbell said he would not do. Then Mr. Town reduced the amount to $20,000, and Mr. Campbell said he would put up $10,000 of this present stock, and that was the best he could do. Mr. Town said he would submit it to Mr. Catlin. Tibbets told me to say to Mr. Campbell that he had 2,500 shares of stock in a Mexican mine now in deposit in escrow with the Chicago Trust Company, awaiting the close of a sale to some Englishmen and that he would give $10,000 of what he was to receive from the Englishmen as security to Campbell, and Tinker said if he could sell from real estate now being negotiated for he could help. In this you have the present situation. To-morrow will decide."

Tibbits testifies that he stated the things which are in the letter stated to have been said by him; that he meant Mr. Campbell could have the 2,500 shares of Mexican mining stock; that Campbell did not take it; that his interest, if the contemplated sale had been carried out, would have been about $25,000. Tibbits testifies that November 25, 1890, Sidney Stevens wrote to him as follows:

"Mr. Campbell paid Mr. Town $200 to-day and wants to be re-imbursed. This I should pay, but must have a little help at this time. Please send me one-third and I will write to Bob to do the same and will in a little while pay him my one-third. He was very much gratified at your offer to send him a paper giving him the right to $10,000 of the amount received from the 2,500 shares in escrow in the Chicago Trust Company. Please let me hear from you.

Yours, etc.,

SID."

And that he, Tibbits, paid one-third of the $200 to Sidney Stevens. It appears that Town received $200 fee for obtaining the extensions of the indebtedness. Tibbits testified: "I never claimed that Campbell ought to have paid the whole of the $200; that the 2,500 shares of Mexican mining stock was offered to Campbell and Tinker to be held as security, not to have it absolutely." Tibbits testified that he knew Campbell was only a surety for Stevens. After Benjamin H. Campbell's death, Tibbits testifies that he had a conversation with Augustus S. Campbell, his son, and that he thinks he said to the son that the Campbell estate was wholly responsible for that indebtedness on the Catlin note; that Mr. Augustus S. Campbell replied, "If my lawyer would allow me to I would pay that note." March 11, 1891, Tibbits received from Catlin the following letter:

"MR. F. G. TIBBITS, Milwaukee.

DEAR SIR: The note made Oct. 1, '90, by yourself, B. H. Campbell, S. A. Stevens and R. H. Tinker for $34,290.05, with interest at seven per cent six months from date, will soon become due.

I shall look to you, Mr. Tinker, and Stevens, to pay this note promptly when due. I don't want to file a claim in Probate Court against the Campbell estate.

Tinker v. Catlin.

Please see that funds are provided to pay the note in full promptly when due. I can not consent to another renewal.
Yours truly,
THOMAS D. CATLIN."

Campbell left an estate valued at over a million dollars. At the time of the maturity of the last note another meeting was had at the office of Town, at which Stevens, Tibbits, Tinker and Augustus Campbell, executor of Benjamin Campbell, were present; that Catlin then said, "I took Stevens' note for $35,000, with B. H. Campbell's indorsement alone, but subsequently, to obtain extension, other names were added, but I have never looked to ascertain their responsibility." While this conversation was in progress Tinker and Tibbits were served with summons in the action at law upon which the judgment on the note was subsequently entered.

Tibbits asked Town if service had been made on Campbell; the answer was "No, we can not sue a dead man, but will have to make a separate suit against B. H. Campbell's estate." It appeared that by the sale of collaterals held as security for the note, it was reduced so that the amount due when judgment was entered, was only $18,169.93.

November 24, 1891, Catlin filed a petition in the Probate Court in the matter of the estate of Campbell, in which he represented that he was a creditor of that estate in an amount of upward of $18,000, and that no inventory had been filed and asked for citation requiring inventory. Nothing further was done by Catlin in the Probate Court against the estate of Campbell. The estate was finally closed December 30, 1893. Two years from the issuance of the letters testamentary in such estate expired November 28, 1892.

KRETZINGER, GALLAGHER & ROONEY, solicitors for appellants.

BENTLEY & BURLING, solicitors for appellee.

MR. JUSTICE WATERMAN delivered the opinion of the court.
In this State, presumptively, Campbell, Tibbits and Tinker

were guarantors of the several notes made by Stevens, upon the back of which their names, respectively, appear. A third party placing his name upon the back of a promissory note is presumed to do so as a guarantor. Kingsland v. Koeppe, 137 Ill. 347; Hately v. Pike, 162 Ill. 241.

The note for $35,000, dated October 1, 1888, had upon the back thereof the following:

" For value received, we hereby guarantee the payment of the within note at maturity or at any time thereafter, with interest at the rate of eight per cent per annum, until paid, and agree to pay all costs and expenses paid or incurred in collecting the same.

SIDNEY A. STEVENS,<br>B. H. CAMPBELL.

For value received we hereby guarantee the payment of the within note at maturity or at any time thereafter, with interest at the rate of eight per cent per annum until paid, and agree to pay all costs and expenses paid or incurred in collecting the same.

B. H. CAMPBELL,<br>F. G. TIBBITS,<br>R. H. TINKER,<br>SIDNEY A. STEVENS.

April 2, '89, received 1225 for interest to April 1, 1889.
Oct. 16, '89, interest paid to October 1, 1889.
Jan. 6, '90, interest paid to Jany. 1, 1890.
Canceled."

Tibbits testifies that there was no guaranty on this note when he placed his name thereon, and that he never consented to the guaranty being placed upon it. Tinker testifies the same as to his signing.

The note to take up the note of October 1, 1888, was dated January 1, 1890. It has been lost. September 1, 1890, Jamieson & Company, with whom it had been left for collection, wrote to Campbell, Tibbits and Tinker, saying that they had this note " indorsed and guaranteed by B. H. Campbell, F. G. Tibbits and R. H. Tinker, and that they had been instructed to demand payment of you (respectively, Campbell, Tibbits and Tinker). It does not appear that either Tibbits or Tinker made a reply to Jamieson & Company, Catlin, or any one, in any way denying the making of such guaranty or the obligation of a guarantor.

Tinker v. Catlin.

Notified as they were by Jamieson & Company and by Stevens that they were guarantors, we can not regard their testimony given some ten years afterward as overcoming the presumption which, under the law, arose from their respective signatures.

Notwithstanding the presumption of guaranty arising from the respective indorsements, either of the guarantors was entitled to show that he was but an accommodation indorser and a surety, and that this was known to the payee. Tiedeman on Commercial Paper, Sec. 261.

So as to the last note upon which judgment was had, Campbell, Tibbits and Tinker were each entitled to show that he was but a surety. Ward v. Stout, 32 Ill. 399.

The question in this case is not, what were the relations and obligations of Catlin, Stevens, Campbell, Tibbits and Tinker upon the former notes, but what was the contract entered into in the making of the note upon which judgment was entered.

If there had ever been any question, it has been established by the decision of the Supreme Court of this State that Stevens, Tibbits and Tinker were joint makers. Stevens v. Catlin, 152 Ill. 56.

The evidence that by agreement Tibbits and Tinker were, in respect to Campbell, sureties, and that a valid contract existed between him and them by which he undertook to hold them harmless, is not, in our opinion, sufficient to sustain the contention of appellants. Certainly Tibbit's name was by him placed upon the note for $35,000, dated September 30, 1887, at the request and for the accommodation of Stevens only. Tibbits may, as he testifies, have indorsed this because Campbell's indorsement was already there and he thought him to be a rich man; but in no way did he do so for the accommodation or at the request of Campbell. Likewise, Tinker's name was by him placed upon the note for $35,000, dated October 1, 1888, at the request and for the accommodation of Stevens only. Tibbits and Tinker testify that thus having become bound, Campbell afterward said to them, severally, that he would take care of

other notes made in renewal of these notes. Campbell's assurance, as stated by Tibbits and Tinker, was entirely indefinite as to time, and so far as appears not only without consideration, but also indefinite as to what he would do. It being sometimes thought it was his intention to take up the note himself and to take the securities himself and assurance that he would do "it;" at others that he had examined the collateral and believed it to be good for the amount of the note, and that as soon as he could arrange his transactions and money to do so, and he hoped before the note matured, he would take the note up and carry the collaterals himself and keep the collaterals as an investment; that just before the note upon which all are makers was made, Campbell said to Tibbits, "You need not worry about the note (then existing), I will take it up, but can't do it now, and to assure you of my sincerity I will say now I will give Catlin $10,000 more security if he will give us six months more time."

Campbell and Stevens are dead. Tibbits and Tinker testify to these conversations, from ten to twelve years after they occurred.

It is quite likely that Campbell did at times say that he thought the collateral good; that he contemplated taking the note up and keeping the collateral; that Tibbits and Tinker need not be uneasy, for the collateral was worth the amount of the note; and it is easy to understand how Tibbits and Tinker have come to honestly believe that he promised to hold them harmless.

Campbell is not here to testify; the written evidence, the writings of the time, do not sustain the recollections of the witnesses. On the contrary they tend to show that upon the previous notes Campbell, Tibbits and Tinker were guarantors. There is in the writings no hint of a claim that Campbell had undertaken to hold appellants harmless.

Neither before the death of Campbell, when payment from them was demanded by Jamieson & Company, nor after the death of Campbell, when Catlin wrote asking for immediate payment from them, saying that he did not want

to be obliged to file a claim against the estate of Campbell, did Tibbits or Tinker urge that Campbell had assured them that he would protect them. The letter written by Tibbits April 22, 1891, nearly five months after the death of Campbell, contains no charge that Campbell had agreed to pay the note.

Appellee was not asked by appellants to prove the claim against the estate of Campbell. We do not mean to say that this was necessary if Campbell was a principal maker and appellants sureties for him; but as all appeared on the note as equally principals, if appellants knew that which they now claim, viz., that there was a parol agreement by Campbell to protect them, it is singular that they did not insist upon this to Catlin.

Campbell did, as he promised, put up $10,000 of additional collaterals; this was one of the conditions upon which the last renewal was taken by appellee, and Campbell, Tibbits and Tinker became joint makers of the last note.

This collateral and other, appear to have been sold and the note thus reduced, being October 1, 1890, $34,290.05, and bearing interest at seven per cent, so that it amounted, June 8, 1891, to $18,169.93.

There is not sufficient evidence that Catlin was, prior to the expiration of two years from the granting of letters testamentary upon the estate of Benjamin Campbell, notified that Campbell was, as to appellants, a principal maker, and they as to him, sureties only. Mr. Tibbits is evidently mistaken when he says that he told Catlin in Town's office that Campbell had said he would take up the note and save him (Tibbits) from worry and responsibility. The conversation with Town at his office by appellants and Campbell, clearly indicates that Catlin was not there; Tinker says that he (Tinker), Stevens and Campbell were there; Sidney Stevens so writes to his brother " Breese."

Town was paid $200 for obtaining the last renewal. Campbell paid this and Tibbits sent to Stevens one-third of this to be paid to Campbell. Why he did this, if Campbell was to pay the note and save him harmless, is unexplained.

The chancellor saw and heard the witnesses as they testi-
fied; such being the case the findings of the court upon
questions of fact will not be set aside unless they are clearly
and manifestly against the preponderance of the evidence;
Lane v. Lesser, 135 Ill. 567, 573; Coari v. Olsen, 91 Ill. 273;
Loucheim v. Seyfarth, 49 Ill. App. 561.

The decree of the Circuit Court is affirmed.